IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEREMY T. GREENE,

                              Plaintiff,

      v.

CHAPLAIN TESLIK, MICHAEL
MEISNER, CINDY O'DONNELL,
KELLI R. WILLARD-WEST,
MS. SCHUELER, KEVIN CARR,
RYAN BLOUNT, and CHARLES
FACKTOR,

                         Defendants.

OPINION AND ORDER

18-cv-116-wmc

---

*Pro se* plaintiff Jeremy T. Greene, a prisoner at Waupun Correctional Institution, is challenging the denial of his access to religious oil in the practice of his Christian faith under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-2(b).  Specifically, Greene claims that in 2013, while incarcerated at Columbia Correctional Institution ("CCI"), defendants Teslik, Schueler, Meisner, Willard-West, Facktor, Blount and O'Donnell denied his individual use of religious oil in violation of the First Amendment's free exercise and establishment clauses, as well as the Fourteenth Amendment's equal protection clause.  Greene also claims that defendants Meisner and Carr are liable in their official capacity on a related RLUIPA claim.

While the Department of Corrections ("DOC") opened up personal use of religious oil to inmates of all faiths in August of 2016, Green filed suit in early 2018 challenging the 2013 denial.  Now before the court is defendants' motion for summary judgment (dkt. #56), which will be granted based on then continuing security concerns with increased

dissemination of such oils among individual users and remaining uncertainty as to the state of the law before August 2016.

## UNDISPUTED FACTS[1]

### A.  The Parties

Greene is a nondenominational Christian.  Although now housed at Waupun, he was an inmate at CCI during all times material to this lawsuit.  Defendants were all Wisconsin DOC employees, and include Columbia's Chaplain Mark Teslik, Warden Michael Meisner, Program Services Manager Schueler, and Inmate Complaint Examiner ("ICE") Ryan Blount.  In addition, Greene names DOC's Secretary Kevin Carr, Administrator Cindy O'Donnell, Division of Adult Institutions ("DAI") Religious Practices Coordinator ("RPC") Kelli Willard-West, and Corrections Complaint Examiner ("CCE") Charles Facktor.

### B.  DOC Religious Property Policy

The DOC gives prisoners opportunities to pursue the lawful practices of their religion of choice.  To that end, the DAI administers religious accommodations through Umbrella Religion Groups ("URGs"), a structure developed in consultation with community faith group leaders.  Prisoners with similar beliefs and practices are grouped into URGs that represent and incorporate the range of religious denominations and sub-

---

[1] Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

groups.  The eight URGs are Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian. Each prisoner may choose and designate an URG, and this designation generally determines which (1) religious services or study groups a prisoner may attend, (2) religious property a prisoner may obtain, and (3) dietary accommodations a prisoner may be eligible to receive.

DAI Policy No. 309.61.02 addresses the acquisition, possession, and use of religious property by inmates, having evolved over time with respect to religious oils.  (Dkt. #59-1.)  When first approved in March 2006, only inmates identifying with the Islamic and Pagan URGs could possess oil, and they were limited to four scents.  In August 2011, *congregate* use of scented oils was also approved for the Catholic URG, and in February 2015, for the Protestant/Other Christian URG.  Finally, as of August 2016, individual *and* congregate use of religious oils was approved for inmates of any URG.

The parties dispute when Greene learned of this expansion.  Greene attests that he did not become aware of it until July 31, 2020, when he received defendants' summary judgment materials.  (Dkt. #82 at 25.)  He specifically disputes that any revised religious property chart was ever placed in the DAI policy documents binder at any of the institutions in which he was housed during and after 2016, and asserts that no religious volunteer or leader ever notified him of the change.  Defendants respond that they provided Greene with the 2016 DAI Religious Property Chart in April 2020 as part of discovery. Defendants further maintain that:  (1) the updated policy would have been available for him to view in any prison law library binder or via written request; and (2) policy changes

3

were also broadcast on an institutional television channel.  (Dkt. #94 at 9-11.)

As it stands now, inmates of any URG may possess in their cells up to one ounce of religious oil in any one of the now five, permitted scents:  Frankincense, Olive Oil, Pine, Sandalwood, and unscented.  (Dkt. #70-1 at 4.)[2]  Contracted vendors sell these religious oils in .5 ounce and/or 1-ounce plastic bottles, depending on product sourcing and marketability.  Among other reasons, inmates are limited to a maximum of one ounce of religious oil in order to reduce:  (1) the opportunity for inmates to hide contraband in their cells and to barter or coerce each other into the illicit exchange of property; and (2) the risk of property hoarding situations that can lead to health, hygiene and pest infestation problems.

Greene does not dispute that olive-scented oil became available as of August 2020, but he remains dissatisfied with this product because it is purportedly neither actual olive oil nor olive oil-based scented oil.  (Dkt. #94 at 45-46.)  Defendants counter that Greene has not submitted evidence that the available oil is dangerous to apply to a person's skin or otherwise inappropriate for religious use, nor has he identified any other olive oil available for sale in the approved amounts and packaging.  (Dkt. #94 at 46.)  DOC's Religious Practices Coordinator ("RPC") Willard-West further attests that it is impossible to honor every inmate's personal product and vendor preferences when making religious accommodations for more than 23,000 inmates.  (Dkt. #59 at 13.)

---

[2] With this expansion of religious oils to inmates of other URGs, the list of allowable scents was initially reduced to three to account for the possible misuse of religious oils as they became available to more inmates.  However, hypoallergenic, unscented oil also became available in October 2016, and olive oil was added in August 2020.

**C. Greene's Attempts to Possess Religious Oil at Columbia**

On January 30, 2013, Greene apparently first attempted to buy a bottle of frankincense-scented oil through Columbia's canteen.  The canteen supervisor denied his order because, as a member of the Protestant/Other Christian URG, Greene was not on the list of prisoners approved to purchase oil.  Greene wrote to Columbia's Chaplain Teslik on February 4 about his desire to purchase religious oil, supporting his request with biblical citations.  Teslik responded by confirming that then DOC policy prohibited members of all Christian URGs from ordering religious oil for personal use.  On February 16, Greene next wrote to Teslik's supervisor, Ms. Schueler, but she also denied his request based on DOC policy.

Although Greene does not appear to have made any further personal requests for religious oil after these denials, he did file two grievances and sought a DOC-wide policy change regarding broader access to religious oils.  Specifically, on February 10, 2013, Greene submitted inmate complaint CCI-2013-3634 about his inability to purchase frankincense oil, explaining that he used religious oil for prayer and anointing.  Greene also argued that he should be allowed to purchase it just as Muslims and Pagans were allowed to do.  Nevertheless, ICE Blount recommended dismissal because at that time non-congregate religious oil was not an allowable property item for the Protestant and Catholic URGs.  Columbia Warden Meisner adopted Blount's recommendation and dismissed the complaint on February 25, 2013.

Greene next appealed to the DOC, challenging the warden's reliance on a policy Greene argued was unfair to Christians.  After consulting with Willard-West, CCE Facktor

recommended dismissal of the appeal because Greene had not yet exhausted his administrative remedies related to this religious practice issue.  Specifically, Facktor noted that Greene had not submitted a Request for New Religious Practice Form (DOC-2075) before pursuing his inmate complaint.[3]  DOC Administrator O'Donnell accepted that recommendation and dismissed the appeal on March 8, 2013.

Consequently, Greene submitted a DOC-2075 form on March 18, 2013, requesting that Christians be allowed to purchase either "an olive oil based" anointing oil (or the same oils as Muslims and Pagans) for individual use.  (Dkt. #60-2 at 11.)  In support, Greene explained that:  "Anointing oil and scented oil (perfumes) are used in my religion to heal from sickness, consecrate items/areas/oneself before God and going to God in prayer.  Oil is also used when fasting, so that others will not be aware of such acts of righteousness." (Dkt. #60-2 at 11.)  Greene again provided numerous biblical citations referencing the use of anointing oil.[4]

Greene's DOC-2075 form request was processed through various defendants, beginning with the Columbia Chaplain Teslik, who recommended denial because he did not see a necessity for Protestant Christians to possess oil for *individual* use, given that they generally used it in a congregate setting and for hygienic, rather than for ritualistic, purposes when fasting.  Teslik attests that he reached this conclusion after reviewing the

---

[3] The parties dispute whether Greene was required to submit a DOC-2075 form before filing an inmate complaint, but that dispute is not material to the court's decision.  (Dkt. #94 at 17-19.) Regardless, Greene proceeded to submit this form, which was also denied as set forth above.

[4] In support of his position before the court, Greene has also submitted an "expert report" from Pastor Elliott Pollasch, describing how the use of oil is not "unusual" in the Christian church and is used in anointing leaders and healing the sick.  (Dkt. #39 at 1.)

New Testament, including those chapters Greene referenced, and reflecting on his knowledge of how the Protestant and Catholic denominations have long practiced corporate anointing of the sick.  (Dkt. #62 at 3-4.)  Although Chaplain Teslik does not use this language, defendants characterize his conclusion as doubtful of plaintiff's sincerity in his purported need for oil, but Greene disputes this proposed fact, noting that *no* defendant ever "asserted" or "indicated" an "intent to challenge [his] belief in a need for [oil] to exercise religion as insincere."  (Dkt. #94 at 26.)  Regardless, Chaplain Teslik then forwarded his denial recommendation to his supervisor at Columbia, Schueler, who agreed and forwarded Greene's request to RPC Willard-West for consideration by the Religious Practices Advisory Committee ("RPAC").

Columbia Warden Meisner attests that RPAC is comprised of individuals with knowledge and expertise of inmate religious beliefs and practices in the DOC's institutions and charged with conducting research and gathering information and input from spiritual advisors in the community concerning New Religious Practices requests.  (Dkt. #65 at 2.) On behalf of RPAC, Willard-West recommended denial of Greene's request as well, suggesting that he "make adapted/symbolic use of other approved property item (baby oil) for his stated purpose," since she did not understand Greene to be indicating that fragranced oil was necessary for the individual practice of his faith.  (Dkt. #60-2 at 12.) At bottom, RPC Willard-West viewed Greene's request as a "want," rather than a "need," and attests that she would have considered Greene's request in the context of "an observable trend in prayer oil-related" requests from inmates at that time.  (Dkt. #59 at 7-8.)  Willard-West further attests that the URG Overview Manual in use at the time of

7

Greene's request "did not indicate that use of religious oils is included in the basic sacraments typically practiced by Christian adherents—in either the congregate setting or within personal use." (Dkt. #59 at 7.)

Columbia Warden Meisner ultimately deferred to RPAC's recommendation and denied Greene's request.  In addition to the information provided by Teslik and RPAC, the warden attests that there are also "security concerns with allowing oil-based substances in individual cells." (Dkt. #65 at 3.)  For example, inmates could oil themselves, making it difficult for staff to grip them during escorts.  Inmates could also oil their floors, creating a safety risk to themselves and to staff that entered their cells.  By limiting the amount of oil and oil-based substances available in prison, Meisner further attests that staff could "promote proper use of the product" and "decrease the ability for misuse." (Dkt. #65 at 4.)  On this latter point, RPC Willard-West similarly attests that she was aware in 2013 of anecdotal incidents of oil misuse among Muslim and Pagan inmates, and she notes generally that "the strong scents may mask the smell of illicit drugs, alcohol, tobacco or other contraband." (Dkt. #59 at 8.)  Finally, Willard-West attests that inmates can create a fire hazard by disseminating scents via a light bulb, and there have been informal complaints of adverse reactions to the strong scents of religious oil among inmates and employees with sensitivities or respiratory conditions.

Greene challenges the validity of these security and safety concerns by noting that the DOC does not similarly restrict many scented and oil-based hygiene items (such as shampoos, lotions, body washes, and shaving creams), liquid food items (such as soybean oil, sauces, and peanut butter), and cleaning products (such as dish soap and detergent).

8

(Dkt. #94 at 48-51.)  Green further asserts that inmates and staff with allergies and respiratory conditions can take steps to reduce their risk of an adverse reaction to fragranced oils.  (Dkt. #94 at 58-59.)  As for light bulbs as heat sources, Greene asserts that most maximum-security prisons have security enclosures over the bulbs used to light cells, and in any event, the DOC could offer non-heat-generating bulbs for reading lamps as a way to reduce that risk.  (Dkt. #94 at 55-56.)

Moreover, the parties do not dispute that Greene's 2013 New Religious Practice request would be decided differently today given subsequent evolution in the caselaw and revisions to the DOC's DAI Policy as of October 2016.  (Dkt. #94 at 44.)  Specifically, RPAC now takes into account that inmates have a right to accommodation based on their personal understanding of religious tenets, not on the interpretation of religious scholars or other authorities, substantially reducing the relevance of the specific URG to which an inmate may have chosen to belong.  (Dkt. #94 at 45.)

Finally, Greene expressed his dissatisfaction with the denial of his New Religious Practice request in inmate complaint CCI-2013-15083, which restated his position that the DOC should allow Christian inmates to purchase olive oil, or at least the same scented oils approved for some in the Muslim and Pagan URGs.  Greene further asserted that applying anointing oil was a ritualistic practice in his faith, and it was "very disrespectful" for RPC Willard-West to suggest that he use baby oil instead.  (Dkt. #60-2 at 10.)  Still, ICE Blount again recommended dismissal of this complaint, noting that:  (1) Greene's related New Religious Practice request had already been denied; (2) DAI Policy did not allow Protestant inmates to possess prayer oil; and (3) he would "not recommend

overriding policy." (Dkt. #60-2 at 2.) Once again adopting Blount's recommendation, Columbia Warden Meisner dismissed Greene's complaint on September 2, 2013.

Greene appealed this denial to the DOC as well, stating that he hoped the CCE would "amend the policy, so that protestant Christians may order and possess anointing/prayer oil." (Dkt. #60-2 at 14.) Instead, CCE Facktor recommended dismissal on policy grounds and Administrator O'Donnell agreed, dismissing Greene's appeal on September 23, 2013, on behalf of the DOC Secretary. O'Donnell also attests that ICE Blount correctly concluded that he could not recommend overriding policy, as that would have been outside of his duties as an ICE. (Dkt. #60 at 4.) Similarly, O'Donnell attests that neither she nor CCE Facktor have the authority to make a policy exception for an individual accommodation, and she considers the members of RPAC to be "the subject-matter experts on religious accommodations and policies in prison." (Dkt. #60 at 5.)

Although never revisiting the issue after 2013, either by personal request or by seeking a policy review, Greene filed this lawsuit approximately five years later. According to defendants, although allowed by August 2016, Greene had still not possessed any religious oil as of July 29, 2020. (Dkt. ##63, 64.)

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-

407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Greene claims that his rights under RLUIPA and the First and Fourteenth Amendments were violated by defendants' repeated denial of access to religious oil for individual use beginning in 2013. Defendants are seeking summary judgment in their favor on all claims, with defendants Blount, Facktor, and O'Donnell asserting lack of personal involvement and all defendants asserting that they are entitled to qualified immunity.[5] Defendants alternatively seek summary judgment on the issue of damages.

## I. Religious Land Use and Institutionalized Persons Act

To begin, defendants Carr and Meisner seek judgment in their favor on Greene's RLUIPA claim against them in their official capacities, which the court will grant. Congress enacted RLUIPA "to provide very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). To prove his RLUIPA claim, Greene has the initial burden to show that a DOC policy substantially burdened his sincere religious belief. *Holt*, 574 U.S. at 360-61. If

---

[5] Plaintiff argues that defendants waited too long to assert their qualified immunity defense, suggesting they could have raised it in a motion to dismiss. (Dkt. # 88 at 79.) However, as defendants note, an immunity defense usually depends on the facts of the case, so it is generally not an appropriate ground for dismissal at the pleading stage. *See Alvarado v. Listcher*, 267 F.3d 648, 651-52 (7th Cir. 2001) (a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds).

11

Green makes this showing, the burden then shifts to the defendants to show that DOC rules are the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1; *see also Burwell*, 573 U.S. at 694. However, Green's RLUIPA claim is moot in light of the DOC's 2016 change allowing his personal use of religious oil similar to that available for those inmates in Muslim and Pagan URGs.

First, as discussed in the screening order, courts have long held that money damages are not available under RLUIPA because the statute has been interpreted as providing only injunctive and declaratory relief. *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). While the United States Supreme Court held in a December 2020 decision that government officials may be sued for money damages in their individual capacities under RLUIPA's sister statute, the Religious Freedom Restoration Act (RFRA). *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020), the Court did not discuss whether its holding applies to RLUIPA as well. Still, this remains an open question, since both statutes contain the same operative provisions about seeking "appropriate relief" against the government, government officials and "other person[s] acting under color of law." 42 U.S.C. §§ 2000bb-1, -2 & 2000cc-2, -5. Even assuming *Tanzin* does alter the remedies available under RLUIPA, however, qualified immunity would still shield all defendants here from monetary damages, given that plaintiff's allegations arose in 2013 and the policy change he sought took effect in August 2016 (or at the latest, when Greene claims he first became aware of this change in late July 2020). Since all of the relevant conduct took place before *Tanzin*, "existing precedent" had "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

12

Second, a "court's power to grant injunctive relief only survives if such relief is actually needed." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149-50 (7th Cir. 2019). A plaintiff is, therefore, entitled to prospective, injunctive relief only if "there exists some cognizable danger of recurrent violation, something more than the mere possibility." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). In 2013, Greene requested that the religious property policy be changed to allow Christians to purchase oils already available to Muslims and Pagans for personal religious use, and to add the option of "an olive oil based 'anointing oil'." (Dkt. #60-2 at 11.) There is no dispute that inmates of all URGs have been able to purchase religious oil since 2016, and that olive oil was added as an option in August of 2020. Of course, the DOC could limit or revoke inmate access to religious oil or to a certain type of religious oil, at some time in the future, but a theoretical possibility "supported only by speculation and not evidence" will not suffice to compel relief. *Nelson*, 570 F.3d at 882. This is especially so when such a reversal would almost certainly violate both RLUIPA and the First Amendment for the reasons discussed further below.

To avoid the seemingly inevitable finding of mootness as to his RLUIPA claim, however, Greene now contends that the olive oil currently available is a "chemical-based, olive-scented" oil, rather than actual olive oil, and he indicates that he requires unscented olive oil. *See Smith v. Exec. Dir. of Indiana War Memorials Comm'n*, 742 F.3d 282, 287 (7th Cir. 2014) (repeal of policy moots claim challenging policy unless "the policy change does not actually correct the asserted . . . problem"). However, Greene did not specifically request unscented olive oil in 2013, nor does he address why the unscented religious oil

currently available is an unsuitable substitute. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (internal quotations omitted)). He also offers no evidence that there *is* an alternative olive oil product that conforms with DOC packaging requirements, nor that such a product is currently available or suitable for religious use and otherwise safe. *Cf. Thomas v. Little*, No. 07-1117-BRE/egb, 2009 WL 1938973, at *5 (W.D. Tenn. July 6, 2009) (prison officials did not substantially burden inmate's religious exercise by only allowing inmate to purchase religious oils from a certain supplier). Regardless, because the changes Greene actually requested in 2013 have been made, his RLUIPA claim against defendants Carr and Meisner in their official capacities is moot, and those defendants are entitled to summary judgment on this claim.

## II. Constitutional Claims

Of course, plaintiff's constitutional claims are not moot to the extent plaintiff seeks damages against the remaining defendants -- Warden Meisner, DAI RPC Willard-West, Chaplain Teslik, Program Services Manager Schueler, DOC Administrator Cindy O'Donnell, ICE Ryan Blount, and CCE Charles Facktor -- in their individual capacities under 42 U.S.C. § 1983 on First Amendment free exercise and establishment clause grounds or Fourteenth Amendment equal protection grounds. Those constitutional claims are addressed separately below.[6]

---

[6] Defendants acknowledge in their reply brief that they did not specifically address plaintiff's equal protection claim in their opening brief, but rely on their establishment clause arguments given that the analysis under either theory is the same in this context. Plaintiff correctly points out that it was defendants' burden as the moving party to raise their arguments from the outset, and generally

## A. Free Exercise of Religion

"An inmate retains the right to exercise his religious beliefs in prison." *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005). However, that right "does not depend upon his ability to pursue each and every aspect of the practice of his religion." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). To survive a motion for summary judgment on his free exercise claims, plaintiff must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citation omitted). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *see also Holt*, 574 U.S. at 361 (defining "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available). At least in the prison context, however, even a substantial burden may be justified if it is "reasonably related to a legitimate penological interest." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016).

### 1. Substantial Burden on Plaintiff's Religious Practice

The parties dispute whether plaintiff's religious practices were substantially burdened while he was without access to religious oil, but plaintiff has done enough to raise a triable issue. Defendants note that the 2011 URG Overview Manual did not include any

---

"[a]rguments raised for the first time in a reply brief are waived." *United States v. Adamson*, 441 F.3d 513, 521 n. 2 (7th Cir. 2006). However, since defendants raise no new argument in reply, the court will address summary judgment on the equal protection claim as well, *subject* to plaintiff's right to supplement his response as to that claim under Fed. R. Civ. P. 56(f).

reference to religious oils in the Protestant/Other Christian section, and as of July 2020, plaintiff had yet to possess any religious oil despite having been able to do so since 2016. As to that latter point, plaintiff counters that he was unaware olive oil was available to him until the end of July 2020, but there is no indication in the record that he has even attempted to purchase this oil since.  To the extent plaintiff could have possessed other kinds of religious oils sooner, he also claims to have been unaware of a change in DOC policy allowing him to do so until he received defendants' summary judgment materials in late July 2020.  (Dkt. #82 at 25.)  As for defendants' further contention that plaintiff had to have known of that oil's availability at least by April 2020, when he received their discovery responses, the upshot is that whether plaintiff's assertions are credible, and how this evidence should be weighed, are still questions of disputed fact.  *See Liberty Lobby, Inc.,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

As to the importance of religious oil to those practicing the Protestant faith generally, plaintiff further attests that in his personal view, the use of religious oil holds great "import throughout Christian holy scriptures," citing many biblical passages referencing its use to heal sickness, to consecrate items and oneself before God, and when fasting.  (Dkt. #82 at 4, 7-9, 13-14.)  Although the Bible does not "demand" the use of oil, Pastor Elliott Pollasch similarly attests in support that "anointing with oil" has long been a practice of the Christian church, the New Testament supports its use to heal the sick and in designating leaders, and it "is also used in the church by the ordinary lay

person." (Dkt. #39 at 1-2.)  As a chaplain who practices the same faith, defendant Teslik also agrees that there is a "biblical basis" for the congregate use of oil by Christians and "to keep up with basic hygiene during times of private fasting." (Dkt. #62 at 4.)  While Teslik and the other defendants argue that the individual use of religious oil is not "an absolute requirement" of Protestantism, the Supreme Court has cautioned that it is "not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989).

That said, "[t]he question is not whether a restriction places a substantial burden on an average adherent, but whether the *plaintiff* is substantially burdened in practicing his sincerely held beliefs." *Jackson v. Raemisch*, 726 F. Supp. 2d 991, 999 (W.D. Wis. 2010) (emphasis in original) (emphasis in original).  There may continue to be cases in which it could be said comfortably that a belief or practice is *so* peripheral to the plaintiff's religion that any burden should be characterized as constitutionally de minimis. *E.g.*, *Thompson v. Bukowski*, 812 F. App'x 360, 365 (7th Cir. 2020) (depriving plaintiff of a few issues of *The Final Call* newspaper was a de minimis burden to his free-exercise rights).  However, the plaintiff here has offered sufficient evidence to at least put in dispute whether he is sincere in his belief that individual use of religious oils is "central" or important to his personal faith practice.

In particular, as a Christian, plaintiff attests that when available, he uses oil daily on his body in communicating on his own with God, as well as during worship services, group study, baptism and communion services, on holidays, and for the consecration of his

17

personal items. (Dkt. #82 at 4.) Without oil, plaintiff further attests that he is unable to perform those acts of faith in a manner obedient to God, and believes he will be denied God's blessing, rewards, and healing. (Dkt. #88 at 41, 59.) Accordingly, plaintiff has done enough to raise a reasonable inference that his personal religious exercise was substantially burdened while prohibited from having any oil, or at least a reasonable jury could so find. *See Henderson v. Jess*, No 18-cv-680-JDP, 2021 WL 1080269, at *6 (W.D. Wis. Mar. 19, 2021) (prohibiting a Muslim plaintiff from possessing prayer oil while in segregation substantially burdened his religious exercise under the First Amendment, because he could not cleanse and purify himself with it, even though this use of oil was not necessarily required by his faith); *cf. Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377 at *6 (W.D. Wis. Aug. 15, 2017) (noting that post-*Holt,* the substantial burden analysis is more favorable to plaintiffs), *aff'd* 723 F. App'x 370 (7th Cir. 2018).

### 2. Legitimate Penological Interest

As previously noted, however, even a substantial burden on an inmate's free exercise rights may still be justified if it is "reasonably related to a legitimate penological interest." *Thompson*, 809 F.3d at 380 (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). In evaluating whether a challenged regulation or restriction is reasonably related to a legitimate penological interest, courts must analyze the four factors established in *Turner*: (1) whether there is a "valid, rational connection" between the restriction and a legitimate government interest; (2) whether the prisoner retains alternatives for exercising the right to free exercise of religion; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can

achieve the same goals without encroaching on the prisoner's right.  482 U.S. at 89-91.

Importantly, "[c]ourts have acknowledged that these factors tend to blend together and

are not meant to be weighed according to any precise formula." *Kaufman v. Schneiter*, 524

F. Supp. 2d 1101, 1108-09 (W.D. Wis. 2007) (collecting cases).

Further, in weighing these factors, the court "must accord substantial deference to

the professional judgment of prison administrators, who bear a significant responsibility

for defining the legitimate goals of a corrections system and for determining the most

appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Moreover, "the burden of persuasion is on the prisoner to disprove the validity of a

regulation," although prison officials "must still articulate their legitimate governmental

interest in the regulation" and provide some evidence supporting their concern.  *Van den*

*Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011).

In this case, plaintiff's 2013 request that he (and by implication, potentially all

other Christians) be allowed religious oil for personal use was repeatedly denied under the

religious property policy.  At least for the relevant period between 2013 and August 2016,

the *Turner* analysis remains a close call in light of the respect courts owe to prison officials

in their security decisions and other prison concerns.  *O'Lone v. Estate of Shabazz*, 482 U.S.

342, 349-50 (1987).  The court begins with the first factor, rational connection, which is

often described as a "threshold factor regardless which way it cuts." *Singer*, 593 F.3d at

534.  Defendants offer four safety and security-based rationales for their historic restriction

on the quantity, types and availability of religious oil:  (1) it can cause adverse reactions

among inmates and employees with respiratory conditions or sensitivities; (2) it can be

used by inmates to mask the smell of contraband or conceal liquid contraband; (3) it can create a fire hazard when inmates place oil onto a light bulb to disseminate the scent; and (4) greater volumes of oil increase the likelihood that inmates will engage in extortion and unauthorized property exchanges.  (Dkt. ##57 at 21-22, 93 at 8.)  Defendants argue that "[e]ven though some inmates were already permitted oil in 2013, allowing additional amounts of oil would have increased the potential for misuse and implicated Corrections' concerns as to oils and liquid products more generally."  (Dkt. #57 at 24.)

Plaintiff does not dispute that safety and security are legitimate penological objectives, nor could he.  *See Overton*, 539 U.S. at 133.  Neither does he dispute that there was reported misuse of oil among those inmates authorized to possess it by 2013.  (Dkt. #94 at 60.)  Rather, he attempts to undermine the relationship between defendants' rationales and the regulation -- overlapping with the fourth factor, alternative means -- by suggesting other ways the DOC might manage increased safety and health risks that would come with many more inmates having additional access to oil.

*First*, plaintiff notes that other oil-based, liquids, as well as scented hygiene, food and cleaning products, including baby oil, were and are readily available to all inmates, despite their possible use to conceal contraband or trigger respiratory distress.  However, prisons cannot opt out of providing "humane conditions of confinement," ensuring "adequate food, clothing, shelter, protection and medical care."  *Farmer v. Brennan*, 511 U.S. 825 at 832 (1994); *cf. Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008) (officials may not deny inmates the minimum civilized measure of life's necessities).  In particular, under the Eighth Amendment, "life's necessities" include "hygiene items," *Gillis v. Litscher*,

20

468 F.3d 488, 493 (7th Cir. 2006), and may also include cleaning supplies. *E.g.*, *Johnson v. Pelker*, 891 F.2d 136, 139-40 (7th Cir. 1989) (reversing summary judgment when a prisoner's requests for cleaning supplies were denied while he was incarcerated for three days in a cell smeared with human defecation and was without running water).

As a result, whether the items plaintiff references should be available to inmates is a question likely to require a different analysis than the court is engaged in here, as the boundaries on the conditions of confinement for prisoners are set by the Eighth Amendment. *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (prison officials violate the Eighth Amendment if they are deliberately indifferent to adverse conditions that deny the minimal civilized measure of life's necessities). Moreover, just because there are *some* potentially dangerous property items allowed in prisons does not mean that it is harmless to allow *or* increase the availability of additional, potentially dangerous property items, nor does it negate the fact that religious oil can pose its own security and safety concerns. Of course, as the importance of each individual's sincere religious beliefs have grown in prominence both under RLUIPA and federal case law, the calculus for the availability of religious property under the First Amendment may rise to that of life's minimal necessities under the Eighth Amendment.

*Second*, as to defendants' fire hazard rationale, plaintiff neither disputes that religious oils are flammable nor that inmates use lightbulb heat to enhance their aroma. Still, with one exception, plaintiff represents that all of Wisconsin's maximum-security prisons use non-incandescent light bulbs in cells, and have installed security enclosures over bulbs, reducing the risk to disbursing personal use amounts of religious oil to inmates

in those institutions.  (Dkt. ##82 at 2-3, 88 at 45-46, 91 at 1-2.)  That assertion is not facially unreasonable, although plaintiff does *not* support it with any exhibits, nor does he attest to facts suggesting he has personal knowledge as to what lighting is used throughout DOC's different prisons.  *See* Fed. R. Civ. P. 56(c)(4) (a declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [declarant] is competent to testify on the matters stated.").  Even if the court inferred personal knowledge, plaintiff does not indicate when each institution began using this lighting, nor otherwise support his assertion that the DOC could in fact "easily" switch to all non-incandescent light bulbs with security enclosures in any currently excepted facility. (Dkt. #88 at 45.)  In addition, as plaintiff acknowledges, many inmates have access to personal reading lamps, as he was able to purchase one while housed at a medium-security facility.  (Dkt. #82 at 3.)[7]

*Third*, plaintiff asserts that restricting scented personal religious oil is an exaggerated response to reports of these oils causing adverse respiratory reactions among staff and inmates.  (Dkt. #94 at 58-59.)  More specifically, plaintiff represents that inmates and prison staff with respiratory conditions are already exposed to odors from cleaning supplies, as well as perfumes and colognes.  (Dkt. #88 at 46-47.)  He also suggests that these individuals can protect themselves with masks in common areas, medication on their

---

[7] As to plaintiff's related point that the DOC could require non-heat generating bulbs for these lamps, he has similarly failed to offer admissible evidence that doing so would have been an easy alternative available at "de minimis cost," even assuming a willing, approved vendor.  *See Overton*, 539 U.S. 126 at 136 ("*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal.").

person, identifying bracelets or lanyards, and priority for selective housing. (Dkt. #88 at 48.) However, plaintiff's speculation that other products or odors also cause respiratory distress, or that these measures will work to reduce adverse reactions are insufficient to defeat summary judgment. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (speculation and conjecture are insufficient to defeat a summary judgment motion). As for plaintiff's suggestion that the DOC offer "natural oils" as opposed to "chemical-based oils," he again fails to present any evidence that these alternative oils exist in packaging and amounts that conform with DOC requirements, and would be any less fragrant or otherwise safer to use. (Dkt. #88 at 46-47.) In the end, plaintiff's arguments generally boil down to the assertion that there are many, potentially dangerous items already available in prisons, which does not mean that allowing more is inconsequential.

*Fourth*, and obviously most problematic for defendants, is plaintiff's point that by 2016, the supposedly burdensome policy had been amended to allow inmates in any URG to keep a limited amount of religious oil in their cells. This wholesale change by the DOC over just three years certainly weakens defendants' purported link between penological interests and its prohibition of religious oil to all but a relatively few inmates in 2013. Taken with the fact that the members of two URGs were already authorized to possess religious oil for individual use in 2013 also demonstrates that there were viable, if arguably not always easy, alternatives to a total ban on an individual's possession and use of religious oil. Moreover, there is no allegation that plaintiff presented a special, individual security risk. *See Henderson*, 2021 WL 10800269, at *7 (noting that the *Turner* analysis was close where the plaintiff was "an assaultive inmate," but could only possess one ounce of oil).

23

Still, that a policy is later changed "does not entirely negate the legitimacy of the governmental interests that supported the earlier policy," nor serve as definitive proof of its irrationality. *See Curry v. California Dep't of Corr.*, No. C-09-3408 EMC PR, 2012 WL 968079, at *9 (N.D. Cal. Mar. 21, 2012) (upholding a restriction on prayer oil for Neterian plaintiff under the *Turner* factors, even though at the relevant time, inmate adherents of two other faiths were permitted oil *and* the restriction was later changed). Here, the religious oil policy at issue was revised over a period of time because of evolving caselaw, and inmate requests (*see* dkt. ##59 at 5, 9-10, 94 at 6-11), including plaintiff's own request for olive oil -- *not* because it was never supported by a legitimate governmental interest. *See Charles v. Verhagen*, 220 F. Supp. 2d 937, 951-53 (W.D. Wis. 2002), *aff'd*, 348 F.3d 601 (7th Cir. 2003) (Wisconsin DOC restriction prohibiting prayer oil in cells survived First Amendment scrutiny given the need to control prison administrative costs). As Willard-West attests, there already were incidents of misuse of oil among those relatively few inmates from the two URGs authorized to have personal use amounts in their possession in 2013, and DOC officials had expressed safety and security concerns about providing religious oil to additional inmates, including those in its larger Christian population.[8] (Dkt. ##59 at 8, 65 at 3-4.) Thus, while the first factor may be a close question, the fourth tilts in defendants' favor.

Turning briefly to the remaining two factors, the second weighs decisively against

---

[8] The DOC's demographic data indicates that in 2013, 58% of the 21,244 male inmates self-reported as Protestant (45%) or Catholic (13%), while 22% self-reported as Muslim (14%) or Pagan (8%). Wisconsin Department of Corrections, *Inmate Profile 2013* 3-4 (June 2014), https://doc.wi.gov/DataResearch/ArchivedReports/InmateProfiles/2013InmateProfile.pdf.

plaintiff's claim, as he does not dispute that he had many alternative means of practicing his religion, even without access to oils. (Dkt. #94 at 34.) *See O'Lone*, 482 U.S. at 352-53 (explaining that while prisoners on work detail are unable to attend Jumu'ah services, they can still participate in other Muslim ceremonies and practices). As for the third factor, there is no reasonable dispute that allowing individual inmates to possess prayer oils *can* pose a safety and security threat in a prison. *See Turner*, 482 U.S. at 89 (the third factor considers how granting a plaintiff's request would impact personnel and threaten the security and safety of DOC institutions). However, again, there is no evidence in this case that plaintiff posed a specific security risk, and one ounce of oil "does not seem particularly risky for a prisoner to have." *Henderson*, 2021 WL 1080269, at *7. Even so, accommodating the request to allow plaintiff and by extension all other Christians, who represent a majority of CCI's inmates, possess oil in their cells would likely require increased security, increased diligence in monitoring in-cell possession, and increased management of a sudden, increased risk of misuse and fire that prison officials were trying to avoid at the time.[9] *Cf. Luther v. White*, No. 5:17-cv-138-TBR, 2019 WL 2214009, at *4 (W.D. Ky. May 22, 2019) (dismissing free exercise claim under *Turner* because "denying inmates access to fire unless absolutely necessary for their religious practice promotes inmate and staff safety").

---

[9] Defendants further assert that "unknown liquid products" are generally more difficult, time-consuming, and costly to screen when they enter a prison. (Dkt. #57 at 21, 24.) To the extent that general statement is true, it is not helpful to defendants here because religious oils are sourced through the canteen, the chapel, or approved vendors who, according to Willard-West, "securely convey standardized, pre-inspected and approved personal property items into our facilities." (Dkt. #70 at 1.) Accordingly, defendants have not shown that religious oils would necessarily raise heightened screening concerns, except perhaps by surreptitious exchanges by visitors.

Balancing of the *Turner* factors is thus no easy task in this case, particularly with the policy itself in transition.  However, even if plaintiff could prevail under *Turner*, he has not overcome defendants' qualified immunity defense for much the same reason.  This doctrine shields officials from civil liability "provided their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known at that time." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted).  A clearly established right is one where "every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

Plaintiff bears the burden of demonstrating that his right to possess personal use quantities of religious oil was clearly established in 2013.  *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).  In an attempt to meet his burden, plaintiff cites to many cases, including cases from other district courts outside the Seventh Circuit.  Those cases have no bearing as to what was clearly established. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) (the right is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful").

Of the relevant body of caselaw, plaintiff relies on *Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012), and *Vinning-El v. Evans*, 657 F.3d 591 (7th Cir. 2011).  (Dkt. #88 at 58.) Although both cases concern First Amendment claims, unfortunately for plaintiff, neither concerns the right of prisoners to keep religious oil in their cells.  *Vinning-El* does not even

26

involve a religious item that could present a security risk; that case addresses the denial of an inmate's request for a vegan diet because his religion required only a non-pork diet. 657 F.3d at 592. Whereas in *Grayson*, an inmate whose faith did not require him to wear dreadlocks was forced to cut them off. 666 F.3d at 451-52.

As plaintiff observes, however, the *Grayson* and *Vinning-El* decisions both caution generally that a sincerely held, minoritarian religious belief is "entitled to as much protection as one espoused by an organized group." *Vinning-El*, 657 F.3d at 593; *Grayson*, 666 F.3d at 453-54 ("Heretics have religious rights"). Accordingly, plaintiff argues that defendants were on notice that "sincerity rather than orthodoxy is the touchstone" when considering an accommodation request, "at least when failure to accommodate a particular belief would amount to discrimination against one sect, or a personal faith." *Vinning-El*, 657 F.3d at 594; *Grayson*, 666 F.3d at 454 (to fall within the First Amendment, a religious belief must be sincere, not orthodox).

Moreover, the evidence here is that the defendants who denied plaintiff's request for access to religious oil for personal use in 2013, acted in part because they did not believe personal use of oil was integral to the practice of plaintiff's Christian religion, as well as in light of their specific safety concerns. (Dkt. ##59 at 6-8, 60 at 4-5, 62 at 2-4, 65 at 3-4.) *Grayson* acknowledged that prison officials can "balance security concerns against religious practices, and that the need to do so may be greater with regard to optional than to mandatory practices." 666 F.3d at 455. *Vinning-El* further allowed for officials to "give *some* consideration to an organization's tenets" in determining whether a professed religious belief is sincere. 657 F.3d at 594. As defendants point out, before *Holt* was decided in

27

2015, it would also have seemed "reasonable for a prison official to ask whether a proposed religious exercise is a practice important to the inmate's professed religion or merely the inmate's preferred style of observance." *Tanksley*, 2017 WL 3503377, at *5.

This is because, at least under pre-*Holt* precedent, a "substantial burden" was "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760-61 (7th Cir. 2003);  *see also Kaufman*, 419 F.3d at 683 (to prevail on a First Amendment Free Exercise Clause claim, the plaintiff had to show a "substantial burden" on a "central religious belief or practice");  *cf. Vision Church v. Village of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006) (stating that meaning of "substantial burden" under RLUIPA "was intended to be interpreted by reference to First Amendment jurisprudence").  Thus, at least in 2013, plaintiff has not presented a clear source of law specifically prohibiting restrictions on prayer oil, nor although a closer question, notifying defendants that they were clearly violating plaintiff's constitutional rights by denying him oil in 2013.[10]  Even if plaintiff could prevail under *Turner*, on this record, therefore, defendants would be entitled to qualified immunity, and thus summary judgment on this claim, at least as to any monetary damages, and just as with his RLUIPA claim, any argument for injunctive relief was mooted by the DOC's change in policy almost two years before plaintiff even brought suit.

---

[10] Even in 2019, the Seventh Circuit considered but did *not* decide whether *Vinning-El* and *Grayson* taken together "clearly established that a prison official cannot deny a prisoner's free exercise rights based on the official's understanding of the tenets of a particular faith." *Neely-Bay Tarik-El v. Conley*, 912 F.3d 989, 998 (7th Cir. 2019).

28

## B.  Establishment Clause and Equal Protection Claims

Finally, overlapping in analysis, defendants are similarly entitled to summary judgment in their favor with respect to plaintiff's remaining Establishment Clause and Equal Protection claims.   In particular, these remaining claims raise the same general question:  whether "the defendant [is] treating members of some religious faiths more favorably without a secular reason for doing so."  *Goodvine v. Swiekatowski*, No. 08-cv-702-bbc, 2010 WL 55848, at *3 (W.D. Wis. Jan. 5, 2010); *see also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in part) ("[T]he Religion Clauses—the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, Art. VI, cl. 3, and the Equal Protection Clause as applied to religion—all speak with one voice on this point:  Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits.").

In support of these claims, plaintiff emphasizes that defendants granted Muslims and Pagans the privilege of keeping religious oil in their cells for personal use *before* members of the Christian and the remaining URGs were allowed to do so.  (Dkt. ##62 at 3-4, 88 at 51, 65-66.)   However, in 2013, it was well-established that affording adherents of all faiths with a reasonable opportunity to practice their religion did *not* mean that each faith is entitled to identical privileges and resources, *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972), although defendants bore the burden of providing a legitimate, secular reason for differential treatment.   To that end, defendants again rely on the safety and security concerns discussed above, and while plaintiff contends that the same concerns would have applied to an individual Muslim's and Pagan's use of religious oil, defendants reiterate that

they did not understand oil to play a central role in the individual religious practices of Protestants/Other Christian URG members at the time.  (Dkt. #57 at 24-25.)  Thus, defendants believed under then good law that they were justified in denying plaintiff's request in the interest of minimizing the amount of oil in the prison and avoiding an increased risk of misuse and demand on prison resources.  Moreover, DOC's Religious Practices Coordinator Willard-West attests to her understanding that prison officials authorized the Muslim and Pagan URGs to possess oil first "as a result of inmate litigation," credibly explaining that the policy was revised over time in light of inmate requests and evolving caselaw.  (Dkt. #59 at 5, 9-10.)

As plaintiff points out, this holding is arguably inconsistent with the Seventh Circuit's 2005 decision in *Kaufman* (dkt. #88 at 64), which reversed summary judgment on an Establishment Clause claim because defendants "advanced no secular reason why the security concerns they cited as a reason to deny his request for an atheist group do not apply equally to gatherings of Christian, Muslim, Buddhist, or Wiccan inmates." 419 F.3d at 684.  However, in 2013, that decision could have been distinguished in a number of respects.  First, while the security concerns themselves may be similar, they are obviously heightened when moving from Muslims and Pagans to include all Christians as a matter of sheer numbers of inmates involved, which although not a particularly satisfying distinction, it was a secular one.  Second, consistent with Willard-West's attestation, there was ongoing inmate litigation on the issue, making but still not yet settling the case law in this area. *E.g.*, *Verhagen*, 220 F. Supp. 2d at 947-52 (under RLUIPA, the Muslim plaintiff is entitled to possess a reasonable quantity of prayer oil in connection with his religious practice);

*Ghashiyah v. Wisconsin Dep't. of Corrections*, No. 01-C-10, 2007 WL 2822005, at *21-22 (E.D. Wis. Sept. 27, 2007) (regulation prohibiting the Muslim plaintiff from possessing prayer oil was reasonable in light of legitimate penological interests).  Third, although obviously not a secular reason, defendants appear to have previously attempted to distinguish between those who had established a need of oil for personal religious reasons to the satisfaction of a federal court, and Christian URGs who had not, except for congregate purposes.

Plaintiff's only factual support for his belief that Muslims and Pagans were singled out for special treatment without any secular justification is that defendants did not document safety or security rationales when denying his inmate complaints, as well as similar requests for oil at the time from inmates of other Christian faiths.  (Dkt. #88 at 53.)  However, those denials shed no additional light on *why* distinctions were made as to individual and congregate use of religious oil between the URGs before 2016.  There being insufficient evidence in this record to support a reasonable inference, much less compel the conclusion, that defendants had no secular reason for initially allowing certain URGs access to religious oil, defendants are entitled to summary judgment on plaintiff's remaining constitutional claims as well.[11]

---

[11] Because plaintiff is not proceeding past summary judgment on his claims, it is unnecessary to address defendants' remaining arguments.

31

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #56) is GRANTED.

2) Plaintiff may have until **May 20, 2021**, to respond to the court's ruling as to his Fourteenth Amendment equal protection claim under Fed. R. Civ. P. 56(f). Otherwise, the clerk of court is directed to enter judgment in favor of all defendants and to close this case.

   Entered this 6th day of May, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge
